**KARL ROVE & COMPANY, Plaintiff–
Appellee, Cross–Appellant,**

v.

**Richard THORNBURGH,
et al., Defendants,**

**Richard Thornburgh, Defendant–
Appellant, Cross–Appellee,**

and

**Raymond P. Dimuzio, Defendant–
Cross–Appellee.**

**No. 93–8451.**

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1994.

---

James C. Winton, Lindsay Lee Lambert, Baker & Hostetler, Houston, TX, for Dimuzio.

Roger M. Adelman, Leslie A. Leatherwood, Kirkpatrick & Lockhart, Washington, DC, for Thornburgh.

Kenneth W. Starr, Christopher Landau, Washington, DC, for amicus curiae: Republican Nat. Committee.

G. Michael Lawrence, Preston Randall, Graves, Dougherty, Hearon & Moody, P.C., Austin, TX, for plaintiff-appellee, cross-appellant.

Before SMITH, WIENER and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

This appeal arises from a diversity jurisdiction suit on a contractual debt. Defendant–Appellant/Cross–Appellee Richard Thornburgh ("Thornburgh") asks us to reverse the district court's judgment holding him personally liable for a contractual obligation incurred during his campaign for the U.S. Senate by the "Thornburgh for Senate Committee" (the "Committee"), Thornburgh's unincorporated principal campaign committee. He argues that the district court erred by finding that—personally and through his general agent, Murray Dickman ("Dickman")—Thornburgh authorized, assented to, or ratified the Committee's contract on which the court held him personally liable. The Republican National Committee ("RNC"), appearing as amicus curiae, argues that the district court ignored notions of federalism, and thus applied an incorrect legal standard, in determining Thornburgh's liability for the Committee's debt.

In response, Plaintiff–Appellee/Cross–Appellant, Karl Rove & Company ("Rove & Company") cross appeals the district court's dismissal of Rove & Company's claim against Defendant/Cross–Appellee, Ray Dimuzio ("Dimuzio") for lack of personal jurisdiction. Rove & Company argues in the alternative that if Thornburgh is not liable for the Committee's contract, then Dimuzio is, thus vesting the court with personal jurisdiction. As we conclude that the district court properly interpreted and applied the correct legal standard, we affirm the district court's judgment holding Thornburgh liable and dismissing Rove & Company's claim against Dimuzio for lack of personal jurisdiction.

## I

## FACTS AND PROCEEDINGS

### A. BACKGROUND

The facts material to the outcome of this appeal are relatively straightforward and, for the most part, undisputed. As the district court in its opinion has already provided an accurate and detailed chronology of the events leading up to this litigation,[1] we limit our reiteration to those facts directly relevant to the issues raised on appeal.

In 1991, Thornburgh ran in a special election to fill the U.S. Senate seat that had become vacant when Pennsylvania Senator John Heinz was killed in an aircraft accident. Dickman, a longtime Thornburgh aide, agreed to the offer of Rove & Company to provide direct mail fundraising services for the campaign, upon Thornburgh's entering into the U.S. Senate race and establishment of a principal campaign committee. The in-

---

1. *See Karl Rove & Co. v. Thornburgh,* 824 F.Supp. 662 (W.D.Tex.1993).

stant dispute arose when, after Thornburgh lost the election, the then-insolvent Committee failed to pay Rove & Company for services that it had provided pursuant to a contract with the Committee, dated September 18, 1991 (the "September Contract").

There is no longer any dispute regarding the existence or quantum of the Committee's liability to Rove & Company on the September Contract. On appeal, therefore, the only issue is whether Thornburgh personally has joint and several liability with the Committee for the debt to Rove & Company. If not, then we must consider whether Dimuzio is personally liable for the debt, and thus subject to the jurisdiction of the court.

The September Contract was between Rove & Company and the Committee, not Thornburgh. That agreement contained a signature line for both parties and identified "Murray Dickman" as the proposed signatory for the Committee.[2] Rove signed the contract and forwarded it to Bob Mason ("Mason"), the Financial Director of the Committee, who, in turn, delivered it to Dickman. But neither Dickman nor anyone else ever signed the document for the Committee. The district court found nonetheless that Rove & Company and the Committee thereafter conducted business according to the terms of the September Contract.[3] There is no evidence in the record, however, that Thornburgh ever saw this agreement or knew of its terms and conditions.

Dickman is a longtime Thornburgh aide, who, according to the district court, was widely known to be Thornburgh's spokesman.[4] Karl Rove ("Rove"), the president of Rove & Company, initiated the contact with Dickman when Rove learned that Thornburgh was interested in running in the spe-cial election to select Heinz' successor. Rove contacted Dickman because Rove was aware of Dickman's association with Thornburgh and knew that Dickman was the person who had been in primary control of Thornburgh's previous campaigns.

True to form, Dickman also played a prominent role during this senatorial campaign. He took part in the Committee's decision to hire Michele Davis ("Davis") as campaign manager, a position characterized as the chief executive officer of the Committee. Dickman was the primary point of contact between the Committee and Thornburgh; Dickman was also one of the persons involved in the Committee's decisions to hire Rove & Company, then whether to pay Rove & Company, and, if so, when to pay Rove & Company.

Dickman conducted the initial negotiations with Rove & Company on behalf of the Committee and, in the early stages of the campaign, delivered much of the material that Rove & Company needed to conduct the direct mail campaign.[5] For example, in response to Rove's request, Dickman obtained and supplied Thornburgh's own list of political donors, a collection of Thornburgh's speeches, personal letters, previous campaign materials, and an exemplar of Thornburgh's signature. Dickman was also the person who instructed Rove that Thornburgh wanted the letterhead on all solicitation letters to read "Dick Thornburgh," not "Richard Thornburgh." In his discussions with Rove, however, Dickman never expressly represented himself as an agent for either Thornburgh or the Committee.

Thornburgh's direct interactions with Rove and with Rove & Company were more limit-

---

**2.** The September Contract also contained the following provision, which required that the Committee designate a representative for the purposes of the contract:

> 4. [THE COMMITTEE'S] REPRESENTATIVE. [The Committee] designates _____ as their [sic] representative for the purposes of this Agreement, and such designation shall constitute [the Committee's] authorization for them [sic] to deal with [Rove & Company] and make all decisions on behalf of [the Committee] pursuant to this Agreement and [Rove & Company] shall be entitled to rely on the advice, decision and

direction of this person as being the advice, decision and direction of [the Committee].

In a September 9, 1991 memorandum to Rove & Company, Committee Financial Director Bob Mason, on behalf of the Committee, designated himself and Michele Davis, the Committee's Campaign Manager, as the Committee's representatives.

**3.** *Karl Rove & Co.*, 824 F.Supp. at 666, 669–70.

**4.** *Id.* at 668.

**5.** Later, Mason and Davis had more direct contact with Rove & Company.

ed than Dickman's. In fact, the district court found that Rove's only personal contact with Thornburgh occurred on September 23 or 24, 1991, when Rove accidentally ran into Thornburgh in an airport.[6] Rove stated that he identified himself to Thornburgh as the person running the direct mail fundraising campaign, and that Thornburgh responded by telling Rove that he was doing a good job and to keep up the good work. At no time, however, was Rove or anyone else told by Thornburgh that he intended to be personally liable to Rove & Company for the September Contract or any other debt incurred with regard to the services provided by Rove & Company.

Thornburgh denied that he knew whom the Committee had retained to provide direct mail fundraising services. He did acknowledge, however, that he was aware that the Committee had contracted to have such services provided and that the Committee was being charged for these services. Neither did Thornburgh object to the Committee's decision to purchase direct mail fundraising services; in fact, he testified that: "I assisted the [C]ommittee in whatever way that I could in helping them to raise money through a direct mail effort" and "I cooperated with [the Committee] and facilitated with them and facilitated their efforts to see that the contract [for direct mail services] went forward."

In support of those fundraising efforts, Thornburgh authorized the Committee to use his signature on the solicitation letters; he made available his political donors' list; and, he reviewed and edited the content and language of several fundraising letters. Thornburgh testified that he inspected the letters for accuracy to "protect his reputation." Although Thornburgh did not review each such letter, the district court found that there was very little variation in these fundraising letters, and that "once Thornburgh had approved the content and language of a given story or statement attributed to him, there would be no need for him to review subsequent letters reincorporating the same substance."[7] Finally, Thornburgh admitted that he had the authority, if he desired, to stop completely all direct mail fundraising efforts on his behalf at any time.

Thornburgh also testified regarding his knowledge of and interactions with the Committee. On his statement of candidacy, Thornburgh designated the Committee as his only "principal campaign committee." He also approved Dimuzio as treasurer of the Committee.

Thornburgh testified, however, that he did not know who was on the Committee, did not select or approve its members, and did not know who had authority to act for the Committee. He further testified that he was not familiar with the inner workings of the Committee, was not involved in the management of Committee finances, did not know how the Committee spent its funds, and played no part in the Committee's selection of vendors in general or Rove & Company in particular.

In light of the fact that Thornburgh is a "very experienced and intelligent politician with intimate knowledge of the inner workings of political campaigns," the district court found that Thornburgh's testimony regarding his attenuation from the Committee lacked credibility.[8] The district court commented that "there is no way a man of his intellect—a man who was entrusted with the governorship of his home state and who served as Attorney General for his nation—did not have control of the organization running his campaign either directly or through persons in his confidence and of his choosing."[9] The district court found more credible the testimony of Mason, who had stated that Thornburgh was "ultimately in control" of the campaign.[10]

In all, Rove & Company completed 28 separate projects, mailed 695,094 letters, and raised over $750,000, netting $425,000 for the Thornburgh campaign. Among those totals, 11,440 solicitation letters were mailed to Texas residents, 306 of whom responded and contributed a total of $83,034. All of the

6. *Karl Rove & Co.,* 824 F.Supp. at 668 n. 8.

7. *Id.* at 675 n. 21.

8. *Id.* at 667.

9. *Id.* at 668.

10. *Id.*

money received by the Committee was used exclusively to fund Thornburgh's campaign for the Senate. Of Rove's total billings to the Committee, $169,732.48 went unpaid, excluding interest and attorneys' fees.

## B. PROCEDURAL HISTORY

Rove & Company filed the instant suit in federal district court against Thornburgh, Dimuzio, and the Committee, seeking recovery for breach of contract, quantum meruit, fraud, and theft of services. A bench trial was held on April 1 and 2, 1993. On June 17, 1993, the district court dismissed Rove & Company's claim against Dimuzio for lack of personal jurisdiction, but held Thornburgh and the Committee jointly and severally liable for breach of contract. Having found liability under this breach of contract, the district court did not address Rove & Company's other theories of liability.

Thornburgh—but not the Committee—timely filed a notice of appeal. Thornburgh complains to us that the district court erred in holding him liable based on the finding that he, personally and through his general agent, Dickman, authorized, assented to, or ratified the September Contract between Rove & Company and the Committee. In particular, Thornburgh challenges the district court's conclusions that he *assented to* the September Contract and that Dickman was his general agent, vested with authority to enter into contracts on behalf of Thornburgh personally.

Not unexpectedly, Rove & Company responds that the district court got it right. Guarding against the eventuality that we might reverse the district court, however, Rove & Company filed a cross appeal in the alternative, urging that the district court's dismissal of the claim against Dimuzio for lack of jurisdiction in personam was error, and reiterating the claim that Dimuzio, as the designated treasurer of the Committee, is personally liable on the September Contract. Dimuzio not only asks us to dismiss Rove & Company's cross appeal but to impose sanctions as well, arguing that Rove's cross appeal is frivolous and inadequately briefed.

11. *Id.* at 671.

12. *Id.* at 671–72.

## II

## ANALYSIS

■ This is truly a case in which procedure imitates substance. Rove & Company is a corporation created under the laws of Texas. The district court properly found that it had jurisdiction over the Committee because the Committee purposely availed itself of the services of this Texas corporation, which would perform a material part of its contractual obligations from and within Texas.[11] Likewise, if either Thornburgh or Dimuzio is held liable for the September Contract—either as a result of such person's or persons' conduct or that of an agent—for availing himself of the Texas Corporation's services, then the court will have personal jurisdiction over such person or persons too as a result of this conduct.[12] Accordingly, we first consider who, if anyone, might be personally liable for the September Contract between Rove & Company and the Committee.

## A. THE LEGAL FRAMEWORK OF THIS DISPUTE

We have never before been called upon to consider the extent to which—or under what circumstances—a candidate for federal office, or the treasurer of such a candidate's unincorporated principal campaign committee, may be held personally liable for a contractual debt incurred by such a committee. Accordingly, we must determine which jurisdiction's body of substantive law governs such situations, then apply that law to the facts of this case.

### 1. *Applicable Substantive Law*

The district court applied substantive state law in concluding that Thornburgh was liable for the Committee's debts. Thornburgh argues that state law is inapposite, as Congress, by enacting the Federal Election Campaign Act of 1971 ("FECA"),[13] preempted the application of state law by immunizing candidates for federal office from personal liability. In its amicus role, the RNC argues that because the resolution of this dispute will

13. 2 U.S.C. §§ 431–455 (1988).

have a significant impact on important federal interests, federal common law, not state law, should govern. We address each argument. in turn.

### a. FECA Preemption

■ For the first time on appeal, Thornburgh contends that by enacting FECA, Congress has preempted the field, thereby barring the application of state law to all situations involving the liability of candidates for federal office for the debts of their principal campaign committees. "We will ordinarily consider an argument advanced for the first time on appeal only if the issue is a purely legal one and if consideration of the argument is necessary to avoid a miscarriage of justice." [14] In light of the importance of clarifying the extent to which candidates for federal office may be held personally liable for the debts of their campaign committees, the legal nature of that issue, the thorough briefing given the issue by both parties, and the extensive interest that has been evidenced in the outcome of this case, we have elected in this exceptional case to exercise our broad discretion by reversing our ordinary practice and considering Thornburgh's preemption argument. Our extraordinary decision to do so here should not be mistaken as any relaxation of our virtually universal practice of refusing to address matters raised for the first time on appeal.

To bolster his argument that FECA expressly preempts state law, Thornburgh relies on 2 U.S.C. § 453: "[T]he provisions of this Act, and the rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to federal office." Thornburgh insists that here Congress expressly stated its intent that federal law preempt state law,[15] so that the court's sole task is to " 'identify the domain expressly preempted.' " [16]

■ Although Thornburgh attempts to stretch § 453 far enough to create a preemptive bar to applying state law to hold federal candidates personally liable, we cannot read FECA as extending that far. First, a "strong presumption" exists against preemption,[17] and "courts have given section 453 a narrow preemptive effect in light of its legislative history." [18] In addition, nowhere in the text of FECA or accompanying regulations is the personal liability of a candidate addressed. Finally, the Federal Election Commission ("FEC") has opined that state law supplies the answer to the question who may be held liable for campaign committee debts.[19] Accordingly, in light of the FEC's view, the strong presumption against preemption, the historically narrow reading of

**14.** *In re HECI Exploration Co.*, 862 F.2d 513, 521 (5th Cir.1988).

**15.** *Bruneau v. FDIC*, 981 F.2d 175, 179 (5th Cir.1992) (noting that "[t]o determine whether a statute has preemptive force, there must be evidence of ' "the clearly manifested intent of Congress" ' that such preemption occur." . (quotations omitted)), *cert. denied,* —— U.S. ——, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993).

**16.** *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993) (quoting *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)).

**17.** *Id.*

**18.** *Stern v. General Elec. Co.*, 924 F.2d 472, 475 n. 3 (2d Cir.1991); *see Weber*, 995 F.2d at 876 ("§ 453 could be read narrowly, referring primarily to candidates' behavior, and preempting state laws regarding contributions only to the extent the federal law prohibited certain kinds of contributions."); *see, e.g., Weber*, 995 F.2d at 877

(§ 453 preempts state laws establishing systems for campaign funding and expenditures); *Stern*, 924 F.2d at 475–76 (FECA does not preempt state law governing whether corporate political contributions were actionable as corporate waste); *Reeder v. Kansas City Bd. Of Police Comm'rs*, 733 F.2d 543, 545–46 (8th Cir.1984) (§ 453 does not preempt state law forbidding officers from contributing to federal campaigns); *see also Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F.Supp. 769, 772 (E.D.Va.1984) (§ 432 preempts state-law cause of action alleging unauthorized use of candidate's name in committee's name).

**19.** FEC, Advisory Opinion 1989–2, 1989 WL 168490 (F.E.C. Apr. 25, 1989) ("The Commission has long held that State law governs whether an alleged debt in fact exists, what the amount of the debt is, and which persons or entities are responsible for paying a debt."). Although admittedly this statement is dicta, we nonetheless believe that it provides an important insight into how the agency charged with enforcing FECA views the extent of that Act's preemptive effect on candidates' liability for campaign debts.

§ 453, and FECA's silence on the issue of candidate liability, we conclude that Thornburgh's argument for express preemption must fail.[20]

 Thornburgh also claims conflict preemption, *i.e.*, that state law cannot be enforced if it stands as an obstacle to the accomplishment of a federal purpose [21]—one of which under FECA is, according to Thornburgh, to separate a federal candidate from the raising and disbursing of funds for his campaign. The primary purpose of FECA, however, is to regulate campaign contributions and expenditures in order to eliminate pernicious influence—actual or perceived—over candidates by those who contribute large sums,[22] not to prevent candidates from spending their own money to get themselves elected. In fact, FECA merely requires that candidates reveal how *much* of their own money they spend; it does not keep a candidate from spending his own money on his own campaign for federal office or limit the amount that he may spend. We therefore reject Thornburgh's second preemption contention that the application of state law in this case obstructs FECA's purposes, thereby creating conflict preemption.

### b. *Federal Common Law & Other States' Laws*

To govern the liability of candidates for federal office for the contractual debts of their principal campaign committees, the RNC entreats us to abandon state law in favor of what, in essence, would amount to a federal common law. The RNC argues that such a radical approach is necessary because the application of state law to the facts of this case would jeopardize two vital and related federal interests: (1) attracting candidates to seek federal elective office, and (2) ensuring the vigor of the entire federal electoral process itself. As federalism imparts to all states a duty not to interfere with preemi-

nent federal policy, the RNC entreats, we should interpret state law in a manner that will least affect these federal interests.

The RNC contends that citizens will be discouraged from seeking federal office if, as candidates, they can be held liable under state law for the debts incurred by their campaign committees. As this case illustrates, the RNC continues, modern campaigns involve significant amounts of money and require a wide range of services that often must be procured from numerous vendors scattered throughout the country. Consequently, deduces the RNC, if each state's law is applied to determine whether a candidate for federal office is liable for debts incurred in that state by his campaign committee, then the candidate will be exposed to a "nightmarish specter" of liability, and will run the risk of being haled into court in any state to answer under each state's substantive law.

The RNC also maintains that the application of each state's law to determine the liability of a candidate for federal office will harm the entire election process. The RNC posits that applying each state's law could result in more cautious and less informative campaigning, as the fear of personal liability might make candidates reluctant to take advantage of the various methods and media available to communicate their message. The RNC perceives these policy concerns to be somewhat analogous to those that prompted the development of the doctrine of official immunity and thus asks us to look by analogy to immunity jurisprudence in fashioning a federal common law rule to apply today.

The RNC does not go so far as to advocate a rule that would immunize candidates from all liability: Rather, the RNC urges that candidates be held liable only in circumstances "[w]here a candidate expressly and intentionally (even if unwisely) assents to

---

**20.** A similar result was reached by the Maryland Court of Appeals in *Parker v. Junior Press Printing Serv., Inc.,* 266 Md. 721, 296 A.2d 377 (1972). In *Parker,* an unsuccessful candidate for Congress argued that the Maryland Fair Election Practices Code ("Election Code"), a law that established campaign finance rules similar to those of FECA, insulated candidates from incurring personal liability for campaign debts. The court rejected the candidate's contention, finding that the Election

Code was not intended to immunize candidates from personal liability; rather, its purpose was to regulate and control campaign financing and to insure centralized responsibility for campaign funds and expenditures.

**21.** *Stern,* 924 F.2d at 475–76.

**22.** *Orloski v. FEC,* 795 F.2d 156, 163 (D.C.Cir. 1986).

personal liability." The RNC argues that this standard dovetails neatly with the common law of agency as applied by some states, which, according to the RNC, provides that neither the candidate nor campaign officials will be held personally liable for campaign debts except insofar as such debts are personally and specifically authorized by the individual in question.[23]

■ Although mindful of the concerns raised by the RNC, we decline its invitation either to abandon the established law of Texas or Pennsylvania in favor of another state's law or to fabricate from the whole cloth a new and entirely untested federal common law.[24] We are not convinced that candidates for federal office are so imperiled by the application of state law to determine their liability for their committees' debts as to warrant either such extreme measure.[25]

A candidate for federal office already has at least two methods by which he could protect himself from personal liability for the contracts entered into by his principal campaign committee. First, he could incorporate his campaign committee.[26] If the committee were incorporated, then the candidate—whether or not he is a shareholder—is shielded from personal liability by the corporate entity,[27] assuming, of course, that he takes no personal action that creates liability apart from the corporation's. Second, a candidate could include in all contracts entered into by his principal campaign committee a provision expressly stipulating that the contracting party may look only to the committee and its assets for compensation,[28] thereby eschewing the candidate's personal liability, either directly or indirectly.

The test of time, we believe, confirms that these options are sufficient to protect candidates. Independent of the briefs filed with this court, our research has revealed remarkably few cases in which vendors have sought to hold candidates, or the officers of campaign committees for that matter, liable for the debts of the committee. We find this particularly noteworthy in light of the significant number of elections held periodically and the huge sums spent in such campaigns. We speculate that those few vendors who do not insist on payment in full in advance simply assume the risk of nonpayment, especially from losing candidates, lest such vendors acquire an undesired reputation within the political industry. Also, we gather that some

23. For this proposition, the RNC cited *Decima Research v. Cichetti*, No. CV–92–0454471S, 1993 WL 214617, 1993 Conn.Super. LEXIS 1441 (June 4, 1993); *W.H. Brewton & Sons, Inc. v. Kennedy*, 110 Daily Wash.L.Rep. 1681 (D.C.Super.Ct.1982); *Richmond Advertising/Reinhold Assocs., Inc. v. Del Giudice*, 66 A.D.2d 701, 411 N.Y.S.2d 251 (App.Div.1978); *Empire City Job Print, Inc. v. Harbord*, 244 A.D. 6, 277 N.Y.S. 795 (1st Dept.1935); *American Art Works, Inc. v. Republican State Comm.*, 177 Okla. 420, 60 P.2d 786 (1936); *Bloom v. Vauclain*, 329 Pa. 460, 198 A. 78 (1938).

24. *O'Melveny & Myers v. FDIC*, —— U.S. ——, ——, 114 S.Ct. 2048, 2052, 129 L.Ed.2d 67 (1994) (" 'There is no federal general common law....' " (quoting *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938))).

25. *Accord Kennedy*, 110 Daily Wash.L.Rep. at 1684 (stating that "the reality [of candidate liability] is not as harrowing as the hypothetical situation which the defendants describe," because candidates can incorporate their committees).

26. *See, e.g.,* Tex.Elec.Code Ann. § 253.092 (West Supp.1994) (discussing treatment of incorporated political committees under the election code).

27. *See Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083, 1086 (1984) (explaining that candidates who incorporate their committees become corporate shareholders, "shielded from personal liability by the corporate entity"); *see also Kennedy*, 110 Daily Wash.L.Rep. at 1684 (noting that "the Kennedy Committee was free to incorporate.... [making] the personal assets of stockholders and others ... not reachable by creditors").

28. *Hafenbraedl v. LeTendre for Congress Comm.*, 61 Wis.2d 665, 213 N.W.2d 353, 354 (1974) ("The members of such a campaign committee can limit their individual liability if they wish by inserting appropriate provisions in the contracts which the committee makes with third parties."); *see Cousin v. Taylor*, 115 Or. 472, 239 P. 96, 98 (1925) ("It is of course possible ... that the [member] may have expressly excluded personal responsibility...."); *Abrams v. Brent*, 362 S.W.2d 155, 159 (Tex.Civ.App.1962, writ refused n.r.e.) ("[P]ersonal liability [for an association's debts] could be contracted against."); *cf. Shortlidge*, 484 A.2d at 1086 ("In the absence of a ... contract stipulation to the contrary, the personal assets of each member who is liable can be reached by creditors of the association.").

losing candidates, looking ahead to possible future campaigns, seek to avoid an equally unsavory reputation in that industry by paying the financial obligations incurred by their campaign committees. Thus, there is a dearth of caselaw on the subject.[29]

We are not convinced that any of the traditional reasons for abandoning settled law is present here. Applying state law has not heretofore proved to be significantly unworkable or inequitable. Courts have not abandoned this approach; neither have the circumstances surrounding the liability of candidates generally so changed of late as to rob this approach of its past relevance or justification.[30] Although the RNC argues that the application of state law to determine a candidate's liability exposes him to a "nightmarish" specter of liability and lawsuits, these precise concerns were raised in dissent and rejected by the majority when the question was considered by the Tennessee Court of Appeals more than thirty-five years ago:

> It is now a matter of general knowledge that a state-wide race for public office, either in a primary or general election, requires the expenditure of many, many thousands of dollars through many different hands for many different purposes.... Obviously, the candidate himself cannot supervise all of these many activities and many others not mentioned above, though he knows and intends that they will be done for him in behalf of his candidacy. In my humble opinion it would not be in the public interest to saddle upon every candidate for state-wide office a potential liability of so many thousands of dollars and the possibility of multiple claims against him with such limited opportunity to protect

and indemnify himself against such liability.[31]

Finally, we remain cognizant of the salient fact that this case is before us on diversity jurisdiction. We therefore sit as an *Erie* court, relegated to applying the applicable state law to the facts before us; federalism instructs us that it is not our place within the constitutional firmament to conjure up a new legal paradigm to replace one already fashioned by our learned colleagues in the state judiciary, or to supplant their considered judgment with that from another state.[32] Accordingly, contrary to the RNC's exhortation to spin new gold out of old straw, we discern this case to burden us with a far more modest, albeit equally difficult, task: to apply faithfully and "federalistically" the appropriate state law to the facts of this dispute. This, of course, requires that we next determine which state's laws to apply.

### 2. *Choice of Law*

■ All parties concede that if state law is applicable, only the laws of Texas or Pennsylvania could govern this case. All parties also recognize that under such circumstances the outcome of this appeal will be the same regardless of which of those two states' laws we apply.[33] This is because both Texas and Pennsylvania, like the majority of the several states that have considered the issue, have applied by analogy the common law rule governing the liability of a member of an unincorporated nonprofit association to determine the liability of a candidate or a campaign committee official for conventional obligations incurred by that candidate's unincorporated campaign committee. Accordingly, like the district court, we will decide this

**29.** See, e.g., Optima Direct, Inc. v. Thornburgh, No. CA 93–0464 (D.D.C. filed Mar. 1993, dismissed Apr. 26, 1994 upon plaintiff's motion).

**30.** See Planned Parenthood v. Casey, —— U.S. ——, ———–——, 112 S.Ct. 2791, 2808–09, 120 L.Ed.2d 674 (1992).

**31.** Rich Printing Co. v. Estate of McKellar, 46 Tenn.App. 444, 330 S.W.2d 959, 960 (1959) (Carney, J., dissenting).

**32.** See Walker v. Armco Steel Corp., 446 U.S. 740, 745, 100 S.Ct. 1978, 1982, 64 L.Ed.2d 659 (1980) (discussing Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)); Ayo v.

Johns–Manville Sales Corp., 771 F.2d 902, 909 n. 4 (5th Cir.1985) ("[W]hen a federal court exercises diversity jurisdiction, the court must apply the law of the forum state ... and when the state court has spoken ... clearly ... we are bound to follow that ruling."); Turknett v. Keaton, 266 F.2d 572, 572 (5th Cir.1959) (per curiam) (stating that in diversity case, federal courts cannot alter settled law of forum state regardless of modern trend in other jurisdictions).

**33.** Karl Rove & Co. v. Thornburgh, 824 F.Supp. 662, 673 (W.D.Tex.1993).

appeal based on the common law as interpreted by jurisdictions, such as Texas and Pennsylvania, that still follow that rule.

### 3. The Applicable Law

#### a. The Law of Unincorporated Nonprofit Associations

As noted, the common law has neither applied nor created a separate legal regime to resolve disputes concerning the liability of persons affiliated with unincorporated political campaign committees; rather, such disputes have been adjudicated by analogical extension of the law of unincorporated nonprofit associations.[34] That kind of associa-

tion typically includes such entities as churches, labor unions, and social clubs.[35]

■ Pursuant to this law, an individual is not liable for the debts of the association merely because of his status as a member or officer of the association.[36] Rather, principles of the law of agency are applied to the particular facts on a case by case basis to decide whether the individual in question is liable.[37] Fundamentally, a member is personally responsible for a contract entered into by the nonprofit association only if—viewing him as though he were a principal and the association were his agent—that member authorized, assented to, or ratified the contract in question.[38] Both Texas and

---

34. *Bloom v. Vauclain*, 329 Pa. 460, 198 A. 78, 79 (1938) ("The principles of law governing the responsibility of candidates and officers of [campaign] committees have been before the courts, and in all cases we have adhered to the rule laid down for voluntary associations."); *Elections Bd. v. Ward*, 105 Wis.2d 543, 314 N.W.2d 120, 123 (1982). ("[A] political campaign committee at common law is to be treated as a voluntary association....").

35. *See* HOWARD L. OLICK & MARTHA E. STEWART, NONPROFIT CORPORATIONS, ORGANIZATIONS, AND ASSOCIATIONS § 1, at 1 (6th ed. 1994).

36. *Bloom*, 198 A. at 79; *Dunlap Printing Co. v. Ryan*, 275 Pa. 556, 119 A. 714, 716 (1923); *see also Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083, 1087 (1984) ("Mere membership in the association, without more, will not generally be sufficient to attach liability for debts incurred in the name of the association."); WILLIAM A. GREGORY & THOMAS R. HURST, AGENCY & PARTNERSHIP 695 (1994) ("[T]he general rule is that mere membership in the association does not result in liability.").

37. GREGORY & HURST, *supra* note 36, at 719 n. 1 ("The basic theory of the common law was that each member of the group is both a principal and an agent as to all the other members of the group.").

38. Annotation, *Personal Liability of Voluntary Association Not Organized for Personal Profit or Contract with Third Person*, 41 A.L.R. 754 (1936), 7 A.L.R. 222 (1920); *see* 2 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 308, at 450–51 (3d ed. 1959) (stating that each member of an unincorporated nonprofit association is "liable only so far as he has personally assented to the transaction in question"); *see, e.g., Azzolina v. Order of Sons of Italy*, 119 Conn. 681, 179 A. 201, 204 (1935) ("[O]nly those members who authorize or subsequently ratify an obligation are liable...."); *Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 176 Ill.Dec. 357, 371, 601 N.E.2d 1055, 1069 (1992) (" '[I]f a member of a voluntary [nonprofit] voluntary association

... expressly or impliedly authorizes a transaction in which an indebtedness is incurred by or on behalf of such indebtation, or if he assents to or ratifies the contract on which such liability is predicated, he is liable as a principal for the indebtedness.' ") (quoting *Severinghaus Printing Co. v. Thompson*, 241 Ill.App. 35, 39 (1926)), *cert. denied*, 148 Ill.2d 653, 183 Ill.Dec. 31, 610 N.E.2d 1275 (1993); *Victory Comm. v. Genesis Convention Ctr.*, 597 N.E.2d 361, 364 (Ind.Ct. App.1992) ("[M]embers of a not-for-profit unincorporated association are liable for the obligations incurred by the association under a contract if the members authorize the contract or subsequently ratify its terms."); *Wilson & Co. v. United Packinghouse Workers of Am.*, 181 F.Supp. 809, 815 (N.D.Iowa 1960) ("Under the Iowa law where members contract in the name of an unincorporated association, they and all of their members who authorize, approve, consent, and ratify the contract are personally ·liable....") (citing *Lewis v. Tilton*, 64 Iowa 220, 19 N.W. 911 (1884)); *Jim Host & Assocs. v. Sharpe*, 639 S.W.2d 784, 785 (Ky.Ct.App.1982) ("[I]ndividual members [of a nonprofit unincorporated association organized for political purposes] may be held liable when they have authorized or ratified the transaction out of which the debt arose."); *Cox v. Government Employees Ins. Co.*, 126 F.2d 254, 256 (6th Cir.1942) (stating that, under Kentucky law, "an individual member of a mutual benefit association, nor organized for gain or profit, is not liable for the debts and obligations of the association, unless he authorizes or ratifies the transactions out of which the obligations or contracts arose"); *Krall v. Light*, 240 Mo.App. 480, 210 S.W.2d 739, 745 (1948) ("[A] member of the association who signs a contract, together with all other members who signed, or authorized, or ratified the signing of the contract are liable."); *Shortlidge*, 484 A.2d at 1086 ("[T]hose members of a non-profit association who have authorized or assented to, or ratified the underlying transaction and thereby have become liable for the association's debts, are personally liable."); *Leslie v. Bendl*, 92 Or.App. 519, 759 P.2d

Pennsylvania have long embraced this rule.[39] In searching for the correct result it is important to remember at all times that this standard differs from the one that governs the liability of members of unincorporated associations organized for profit or to conduct a business, which standard determines liability of members under principles of partnership law, rather than the law of agency.[40]

b. *The Rationale for Holding Members of Unincorporated Nonprofit Associations Liable for Contracts Entered into by the Association*

▮▮▮ At common law it was necessary to hold certain members of an unincorporated association personally liable for the association's contracts to protect third parties with whom the unincorporated association dealt. This was because an unincorporated association was not recognized as a juridical entity and thus could not be held liable for contracts entered into in its name.[41] Consequently, when a member contracted for services on behalf of an unincorporated nonprofit association, the common law treated that member as though he had represented himself to be the agent of a nonexistent principal. Under the law of agency, such a putative agent was and is held liable for the contract entered into on behalf of the nonexistent principal.[42]

In the modern era, Texas,[43] Pennsylvania,[44] and many other states,[45] have enacted

---

301, 302 ("At common law, a debt of an unincorporated association was jointly and severally the liability of and collectible from individual members who authorized or ratified the acts which resulted in the debt."), *cert. denied,* 307 Or. 245, 767 P.2d 75 (1988); *FDIC v. Tyree,* 698 S.W.2d 353, 354 (Tenn.Ct.App.1985) ("Members of [a nonprofit] association may be liable on contracts ... of the association when the members have given their assent or subsequently ratified the contract."); *see also Elections Bd. v. Ward,* 105 Wis.2d 543, 314 N.W.2d 120, 123 (1982) (" 'Each member of a voluntary association is liable for the debts thereof if incurred during his period of membership and contracted for the purpose of carrying out the objects for which the association was formed.' " (quoting *Vader v. Ballou,* 151 Wis. 577, 139 N.W. 413 (1913))).

**39.** *See Bloom,* 198 A. at 79; *Wortex Mills, Inc. v. Textile Workers Union of Am.,* 380 Pa. 3, 109 A.2d 815, 822 (1954) ("Officers and individual members of ... [an] unincorporated association are liable for acts which they individually commit or participate in or authorize or assent to or ratify."); *Dunlap Printing Co.,* 119 A. at 716 (" 'The members of unincorporated associations ... are individually liable for the debts of the organization which they contract, or authorize.' ") (quoting *Franklin Paper Co. v. Gorman,* 76 Pa.Super. 276, 280 (1921)); *Cox v. Thee Evergreen Church,* 836 S.W.2d 167, 170 (Tex.1992) ("In regard to contracts, members incurring the debt on behalf of the association or assenting to its creation were personally liable."); *Abrams v. Brent,* 362 S.W.2d 155, 159 (Tex.Civ.App.1962) ("[I]t is held that members of an unincorporated religious association who incur a debt for the association or who assent to its creation are personally liable therefor."); *see also Reading Co. v. City of Phila.,* No. 91–CV–2377, 1992 WL 392595, at *6 (E.D.Pa. Dec. 17, 1992) ("[U]nder Pennsylvania law, the officers or individual members of unincorporated associations are liable for the acts

which they individual commit or to which they contribute or authorize or ratify.")

**40.** 2 WILLISTON, *supra* note 38, § 308, at 449 (contrasting liability of members of nonprofit unincorporated associations with that of unincorporated associations organized for profit); *see* 6 AM.JUR.2D *Associations & Clubs* § 46, at 478–79 (1963); 7 C.J.S. *Associations* § 31, at 77 (1980).

**41.** *See Cox,* 836 S.W.2d at 169–70 ("Historically, unincorporated associations were not considered separate legal entities and ... a judgment could not be rendered against such an association."); *Hutchins v. Grace Tabernacle United Pentecostal Church,* 804 S.W.2d 598, 599 (Tex.App.—Houston [1st Dist.] 1991) ("An unincorporated association is not liable on its contracts...."); *see also* 7 TEX.JUR. *Associations & Clubs* § 10 (3d ed. 1980) ("[I]n the absence of statute, an unincorporated association is not a legal entity, contracts entered into its association name do not render it subject to liability, and such contracts are regarded as those of individual members who authorized or ratified the contract." (footnotes omitted)).

**42.** *See Cousin v. Taylor,* 115 Or. 472, 239 P. 96, 97 (1925); *Smith & Edwards v. Golden Spike Little League,* 577 P.2d 132, 133 (Utah 1978).

**43.** TEX.R.CIV.P. 28 ("Any ... unincorporated association ... may sue or be sued in its ... common name for the purpose of enforcing for or against it a substantive right."); *see also Cox,* 836 S.W.2d at 171 & n. 5 (same).

**44.** *Spica v. International Ladies Garment Workers' Union,* 388 Pa. 382, 130 A.2d 468, 477 (1957) (noting that by statute, Pennsylvania "made unincorporated associations subject to suit").

**45.** OLICK & STEWART, *supra* note 35, § 446 at 1363 & n. 141; *see, e.g., Hartford Accident & Indem. Co. v. Sena,* 42 Conn.Supp. 336, 619 A.2d 489, 494 (1992); *Elections Bd. v. Ward,* 105 Wis.2d

statutes permitting unincorporated associations to sue and be sued. In many of these "entity" states, third parties who contract with unincorporated nonprofit associations may now pursue a cause of action against the assets of the association itself. In such jurisdictions, therefore, a member of an association who enters into a contract on behalf of the association is not contracting for a nonexistent principal. One could argue, therefore, that it is no longer necessary or even appropriate for the laws of these jurisdictions to permit third parties to sue individually the members of an association for the contract debts incurred by the association in its own name. The argument would go as follows: The third party is no longer being misled or deceived about a nonexistent principal; such a party is contracting with a disclosed, juridical entity, the assets of which can be reached to satisfy any debt that the association may owe.

As appealing and logical as that argument might appear, however, that is not the way the law has developed. The courts of the states that have adopted statutes permitting suit against unincorporated associations have not altered or supplanted the preexisting common law rule governing the personal liability of association members.[46] The courts of both Pennsylvania and Texas have continued to hew to this line.[47]

### c. Problems With Applying the Law of Unincorporated Nonprofit Associations to Political Campaign Committees

Not surprisingly, borrowing from the law of unincorporated nonprofit associations to resolve disputes involving unincorporated campaign committees has presented some practical difficulties. Churches and social clubs often have bylaws or other instruments of governance that outline how the particular organization is going to be operated. For example, such documents typically describe the formalities by which one may become a member of the organization, or by which the association may enter into contracts with a third party.[48] As a result, many such associations maintain membership rosters or attendance records of group gatherings and meetings; and frequently, prior to committing the association to a contract with a third party, poll the membership to ascertain whether a consensus exists in support of the contemplated action. By sampling the membership, the association thus determines the number, and often the identity, of those members who assent to the undertaking.

Political campaign committees typically are not organized and operated in this manner because they are usually formed for limited purposes and short durations. The typical political campaign committee does not have bylaws; does not create or maintain a "membership" roster (assuming that "membership" is even a proper concept in the context

543, 314 N.W.2d 120, 123 (1982) ("[B]y the Laws of 1959, . . ., the Wisconsin legislature explicitly recognized that unincorporated associations may be suable entities." (citation omitted)).

**46.** *Jim Host & Assocs. v. Sharpe*, 639 S.W.2d 784, 785 (Ky.Ct.App.1982) ("We do not view the fact that an unincorporated association has been held to have 'sufficient legal entity' to be sued . . . as in any way modifying established common law principles regarding the liability of individual members of such an association for its debts."); *Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083, 1087–88 (1984) ("We find that [the statute] permitting an association to be sued in its assumed name, does not preclude a plaintiff from pursuing his common law right · to proceed against each individual member of the association." (citing cases)); *Leslie v. Bendl*, 92 Or.App. 519, 759 P.2d 301, 302 (1988) (stating that statute permitting association to be sued in its own

name "cannot modify the substantive individual liability of the members").

**47.** *See, e.g., Kerney v. Fort Griffin Fandangle Ass'n*, 624 F.2d 717, 720 (5th Cir.1980) ("Texas law permits entity suits against unincorporated associations, [but] it specifically provides that the grant of entity status does not 'affect nor impair . . . the right of any person to sue the individual stockholder or members.' " (quoting Tex.Rev.Civ. Stat.Ann. art. 6138 (Vernon 1976))); *Wortex Mills, Inc. v. Textile Workers Union of Am.*, 380 Pa. 3, 109 A.2d 815, 822 n. 3 (1954) (stating that statutes permitting suit against associations eo nomine did not alter the "applicable principles of substantive law holding members of an unincorporated association individually liable upon claims against the association").

**48.** *See* Olick & Stewart, *supra* note 35, §§ 63–64, at 170–90 (describing various methods and documents that may be used to establish an unincorporated nonprofit associations).

of a political campaign committee); and does not consult its "members" every time the committee incurs a contractual obligation. Accordingly, as the instant case illustrates, the law of unincorporated nonprofit associations can be less than ideally suited to determine precisely who may be held accountable for the contractual debts incurred by an unincorporated campaign committee. Nonetheless, it is our task to resolve the instant controversy based on this body of law.

## B. LIABILITY OF THORNBURGH FOR THE SEPTEMBER CONTRACT WITH THE COMMITTEE

There is no dispute that Rove & Company and the Committee were the only nominate parties to the September Contract; both the language of the instrument and the intent of all parties are clear. As the district court properly concluded, and the parties do not contest on appeal, the Committee is liable for all amounts owed Rove & Company under that agreement.

Again, the only issue before us is whether—in addition to the Committee—Thornburgh, or in the alternative, Dimuzio, is jointly and severally liable with the Committee for its contractual debt. To answer this question, we must ascertain whether either man personally, or through his agent, authorized, assented to, or ratified the September Contract.

In holding Thornburgh liable, the district court found that he had assented to the September Contract. On appeal, Thornburgh proffers two arguments why this conclusion was wrong. He first argues that he was never a member of the Committee and, he contends, only "members" or officers of the Committee can assent to, authorize, or ratify Committee contracts. Second, Thornburgh asserts that, even if he were deemed to be a "member" of the Committee or otherwise had the capacity to incur personal liability for the Committee's debts, he did nothing that could rise to the level of an assent to this agreement. We address each argument in turn.

### 1. Thornburgh's Capacity to Assent

The district court found that "the law provides for personal liability if a member *or* officer *or* candidate authorizes, assents to, or ratifies a committee transaction." [49] Thornburgh challenges this statement of the law, claiming that under the law governing unincorporated nonprofit associations only "members" or "officers" of the association have the legal capacity to incur personal liability for its debts.

Again, state law answers the question, "who may be held responsible for the debts of an unincorporated political campaign committee?" [50] In decisions addressing the liability of individuals for the debts of such committees, state courts have frequently recited the governing legal standard in terms of the actions of "officers" or "members" or both. [51] We do not read these cases, however, to exclude the capacity of the candidate qua candidate—by his own acts—to become liable for the debts of his designated principal campaign committee. To the contrary,

**49.** *Karl Rove & Co. v. Thornburgh*, 824 F.Supp. 662, 667 n. 7 (W.D.Tex.1993).

**50.** *See* FEC, Advisory Opinion 1989–2, 1989 WL 168490 (F.E.C. Apr. 25, 1989) ("The Commission has long held that State law governs whether an alleged debt in fact exists, what the amount of the debt is, and which persons or entities are responsible for paying a debt."); *cf. Kerney*, 624 F.2d at 720 (stating that "whether only members of the association, or only the association itself, or both the association and its members may be held liable for its wrongs ... rests, as it always has, with the state rule of decision in diversity cases").

**51.** *See, e.g., Wortex Mills, Inc.*, 109 A.2d at 822 ("Officers and individual members of ... [an] unincorporated association are liable for acts which they individually commit or participate in or authorize or assent to or ratify."); *Dunlap Printing Co. v. Ryan*, 275 Pa. 556, 119 A. 714, 716 (1923) (" 'The members of unincorporated associations ... are individually liable for the debts of the organization which they contract, or authorize.' ") (quoting *Franklin Paper Co. v. Gorman*, 76 Pa.Super. 276, 280 (1921)); *Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 170 (Tex. 1992) ("In regard to contracts, members incurring the debt on behalf of the association or assenting to its creation were personally liable."); *see also Reading Co. v. City of Phila.*, No. 91–CV–2377, 1992 WL 392595, at *6 (E.D.Pa. Dec. 17, 1992) ("[U]nder Pennsylvania law, the officers or individual members of unincorporated associations are liable for the acts which they individual commit or to which they contribute or authorize or ratify.").

many of these cases implicitly recognize that candidates have such capacity.

In *Bloom v. Vauclain,*[52] for example, the Pennsylvania Supreme Court drew no distinction among candidates, members, and officers in its discussion of the rule governing the liability of individuals for the debts of campaign committees:

> The principles of law governing the responsibility of *candidates* and officers of such committees have been before the courts, and in all cases we have adhered to the rule laid down for voluntary associations. The mere fact that one is a *candidate*, an officer, or a member of a political organization does not, of itself, establish his liability, personally or otherwise, for debts incurred by that organization.... But those who make a contract, not forbidden by law, are personally liable, and all are included in such liability who assented to the undertaking.[53]

Likewise, in *Progress Printing Corp. v. Jane Byrne Political Committee,*[54] *Hunt v. Davis,*[55] and *W.H. Brewton & Sons, Inc. v. Kennedy,*[56] state courts discussed the potential personal liability of the candidate in a manner reflective of the fact that those courts drew no distinction among the respective capacities of the candidate, a member, and an officer of the committee, to incur liability for a campaign committee's debts.[57]

In fact, we have uncovered only one other case in which the question of a candidate's capacity to assent to a contract of his campaign committee was even raised.[58] The opinion in that case is unclear whether the committee in question was the candidate's principal campaign committee; and we are aware of *no* decision in which a court has held in favor of a candidate based on a finding that he lacked the capacity to incur liability for his principal campaign committee's debts.

■ Thornburgh offers no legal foundation to support his conclusionary assertion that courts should fashion a rule that would insulate the candidate (but not the members and officers of his committee) from personal liability for the debts incurred by the candidate's principal campaign committee. Query whether any reasonable explanation even exists, given that such a rule would appear to defy both logic and equity. To hold that candidates do not have capacity to incur lia-

52. 329 Pa. 460, 198 A. 78 (1938).

53. *Id.* at 79 (emphasis added).

54. 235 Ill.App.3d 292, 176 Ill.Dec. 357, 601 N.E.2d 1055 (1992).

55. 387 So.2d 209 (Ala.Civ.App.), *cert. denied,* 387 So.2d 213 (Ala.1980).

56. 110 Daily Wash.L.Rep. 1681 (D.C.Super.Ct.1982).

57. *Jane Byrne Political Comm.,* 176 Ill.Dec. at 371, 601 N.E.2d at 1069 ("[L]ike any member of a voluntary association who knows, or should have known under the circumstances, that a transaction has occurred and who then accepts its benefits for herself, the *candidate* here may be held liable for the [campaign] Committee's debts." (emphasis added)); *Hunt,* 387 So.2d at 211 (noting that individual liability will attach only if a member, "here the candidate," authorized or ratified the transaction); *Kennedy,* 110 Daily Wash.L.Rep. at 1681, 1686 (D.C.Super.Ct.1982) (finding that the committee "does not have ... members," but that Kennedy nonetheless could be held liable if the evidence showed that "he authorized or ratified the obli-

gation in a manner that reasonably implicated his personal credit").

58. In *FDIC v. Morrison,* Nos. 85–5272, 85–5273, 1987 WL 37065 (6th Cir. Apr. 14, 1987) (table opinion at 816 F.2d 679), Randy Tyree, a candidate for governor, argued that, because he was not a member of the unincorporated campaign committee "Tennesseans for Tyree" he could not be held personally liable for a promissory note executed by P. Douglas Morrison as chairman of that committee. The Sixth Circuit implicitly rejected this argument, as it reversed a district court judgment granting summary judgment in favor of Tyree. In its opinion, the Sixth Circuit noted that summary judgment was inappropriate as two questions of material fact existed: whether Tyree (1) was a "member" of the committee and (2) ratified the note.

The Sixth Circuit remanded the case to the district court, which then ruled that Tyree was not liable as he neither ratified nor agreed to be held personally liable for the note. The Sixth Circuit affirmed this decision in *FDIC v. Tennesseans for Tyree,* 886 F.2d 771 (6th Cir.1989). The Sixth Circuit found that Tyree did not ratify the note, as under Tennessee law, to receive a "benefit" from a loan, the loan must be used to increase money in hand or to extinguish personal liabilities. *Id.* at 775.

bility for the debts of their principal campaign committees but that members and officers do could very well lead to perverse and anomalous results: Campaign committee officers and members could incur personal liability for campaign committee debts by assenting to or ratifying such debts but the candidate, for whose election the officers and members labor, could not. Although we recognize that Congress has constructed a somewhat analogous—and anomalous [59]—legal regime to shield candidates from liability for violations of FECA, absent express direction from that branch, we decline to extend further such an apparently inequitable rule.

As the district court concluded that a candidate qua candidate does have the capacity to incur personal liability, the court was not required to make—and thus did not make—a specific ruling whether Thornburgh was a "member" of the Committee. We agree with the district court's conclusion of law as to a candidate's capacity to incur liability, but we also are satisfied that, as a matter of fact, Thornburgh was a "member" of the Commit-

tee. At the very least, Thornburgh's active participation in the Committee's activities estops him from denying membership in the Committee.

 The record contains no Committee membership roster or list, a fact we do not find particularly surprising in light of the nature of political campaign committees. Although the Indiana legislature enacted a provision specifically stating that a candidate is an "ex officio member" of his own campaign committee,[60] neither Congress nor Pennsylvania or Texas lawmakers have been so accommodating.[61] Neither are we aware of any other such legislation.[62] Finding little guidance from the Committee's documents or applicable state statutes, we next examine state common law to determine whether Thornburgh was a member of his own principal campaign Committee.[63] Under both Texas and Pennsylvania law, an "unincorporated association" is defined generally as "a body of individuals acting together for the prosecution of a common enterprise." [64] As such entities typically are loosely organized, written formalities are not required for member-

59. *See FEC v. Gus Savage for Congress '82 Comm.*, 606 F.Supp. 541, 546-47 (N.D.Ill.1985) (commenting that this aspect makes FECA "perhaps the most ingeniously unfair piece of legislation ever enacted by Congress").

60. IND.CODE ANN. § 3-9-1-8 (West 1994) ("A candidate is an ex officio member of the candidate's committee."); *see Victory Comm. v. Genesis Convention Ctr.*, 597 N.E.2d 361, 363 (Ind.Ct.App. 1992) ("[Indiana] law unequivocally defines the status of [candidate] and [campaign treasurer] as members of the [campaign] Committee.").

61. Pennsylvania law requires only that a campaign committee identify its treasurer and chairman. PA.STAT.ANN. tit. 25, § 3242 (1992) (organization of political committees). FECA requires that a candidate's principal political committee identify its treasurer. 2 U.S.C. § 432(a). Texas requires that candidates for federal office comply with federal law, *i.e., identify their treasurers.* TEX.ELEC.CODE ANN. § 251.006 (West Supp.1994) (Federal Office Excluded).

62. We do note that some other states provide that a candidate has broad authority over his committee and its members. *See, e.g.,* MO.ANN. STAT. § 130.011(7)(b) (Vernon 1994) ("A committee is presumed to be under the control and direction of an individual candidate ... unless the candidate files an affidavit ... stating that the committee is acting without control or di-

rection on his part...."); UTAH CODE ANN. § 20-14-3 (1994) (stating that the "candidate may revoke the selection of any member of the campaign committee").

63. *See, e.g., Hafenbraedl v. LeTendre for Congress Comm.*, 61 Wis.2d 665, 213 N.W.2d 353 (1974) (applying common law definition of an unincorporated association and finding it a "fair inference," under liberal construction of plaintiff's complaint, that chairman, treasurer, and manager of political campaign committee were "members" of the committee); *cf. Airington v. Juhl,* 883 S.W.2d 286 (Tex.Ct.App.—El Paso 1994) (applying common law definition to determine whether group of abortion protesters were an "unincorporated association").

64. *Reading Co. v. City of Phila.*, No. 91-CV-2377, 1992 WL 392595, at *6 (E.D.Pa. Dec. 17, 1992) (citing *Selected Risks Ins. Co. v. Thompson,* 520 Pa. 130, 552 A.2d 1382 (1989)); *see Cox v. Thee Evergreen Church,* 836 S.W.2d 167, 169 (Tex. 1992) ("An unincorporated association is a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective."); *see also* OLICK & STEWART, *supra* note 35, § 11, at 33 (defining unincorporated association as a "body of people united in purpose and acting together, usually with a formal charter").

ship; a person joins an association when—either expressly or tacitly—he is accepted as, and agrees to become, a member.[65] The intent of both parties, the putative member and the association, is what governs.[66] Whether a person is a member of an association is a question of fact.[67]

 Thornburgh testified conclusionally that he was not a member of the Committee. Circumstantial evidence, however, may be considered to determine whether a person acted in a manner evincing membership.[68] In the instant case, we are satisfied that such evidence compels the conclusion that both Thornburgh and the Committee contemplated his membership.

The Committee was formed for the sole purpose of promoting Thornburgh's senatorial candidacy during Pennsylvania's 1991 special election—obviously an objective shared by Thornburgh himself. As Thornburgh and the Committee shared this common goal, the only open question remaining is what was the intent of each party, i.e., did Thornburgh intend to associate voluntarily with the Committee and did the Committee approve of his affiliation, either expressly or implicitly.

Based on the record before us, we believe that the evidence strongly supports affirmative answers to both questions.[69]

We note initially that a candidate is not necessarily a member of any committee established to promote his election. We are aware of two instances—and there are likely more—in which candidates were completely uninvolved with, and in one case even opposed to, the efforts of committees ostensibly organized to support their candidacy for federal office.[70] In both cases, however, the candidates made clear that they had no intention of affiliating with the committees.[71] This, however, is not such a case.

The instant record is replete with evidence that Thornburgh and the Committee voluntarily chose to associate with one another. Thornburgh designated the Committee as his one and only "principal" campaign committee. By doing so, Thornburgh expressly sanctioned the Committee as the only organization authorized to receive and expend contributions on his behalf.[72] He campaigned extensively in concert with employees of the Committee; spoke almost daily with Committee employees who were supporting his

---

**65.** 7 C.J.S. *Associations* § 19, at 54.

**66.** *Id.*

**67.** *Id.; see Lunsford v. City of Bryan*, 292 S.W.2d 852, 854 (Tex.Civ.App.1956) ("Membership is a question of fact."), *rev'd on other grounds*, 156 Tex. 520, 297 S.W.2d 115 (1957).

**68.** *See Libby v. Perry*, 311 A.2d 527, 531 (Me. 1973) (stating that "proof of participation in its organization, meetings, and activities," is sufficient to support finding that persons accepted membership in an unincorporated nonprofit association); *Francis v. Perry*, 82 Misc. 271, 144 N.Y.S. 167, 173 (Oneida County Ct.1913) (considering acts by alleged member to determine intent and understanding of parties regarding his status in the association).

**69.** We are aware of only two decisions where courts found that a candidate for federal office was *not* a member of his campaign committee. Neither finding was relevant to the resolution of either case. *See Pittman v. Martin*, 429 So.2d 976 (Ala.1983) (reversing trial court's summary judgment in favor candidate for the U.S. Senate in wrongful death action arising out of aircraft accident during campaign); *W.H. Brewton & Sons, Inc. v. Kennedy*, 110 Daily Wash.L.Rep. 1681 (D.C.Super.Ct.1982) (expressly finding that committee "does not have . . . members," but

concluding nonetheless that candidate still could be held liable).

**70.** *See FEC v. Florida for Kennedy Comm.*, 681 F.2d 1281, 1287 (11th Cir.1982) (finding that candidate did not control committee organized to promote his candidacy); *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F.Supp. 769, 771 (E.D.Va.1984) (suit brought by congressman and his official campaign committee to stop an independent political action committee from raising funds in the name, and on the behalf, of the congressman's election to U.S. Senate).

**71.** *See Florida for Kennedy Comm.*, 681 F.2d at 1282 (noting that before entering the race, the candidate "specifically disavowed [the committee's] activities"); *Friends of Phil Gramm*, 587 F.Supp. at 771.

**72.** 2 U.S.C. § 431(5) (defining the principal campaign committee as the committee "designated and authorized by a candidate" to receive contributions or make expenditures on the candidate's behalf); *see* 25 Pa.Stat.Ann. § 3243 (1994) (providing that a political committee cannot receive contributions until "authorized in writing by the candidate"). This provision gives the candidate the ultimate control over whether a committee can enter into contracts to promote his candidacy.

candidacy; and actively facilitated contracts entered into by the Committee (as noted, for example, Thornburgh reviewed and approved several vignettes appearing in fundraising letters for the September Contract, and facilitated its performance by providing a signature exemplar and his personal mailing lists). And—in the words of Mason—Thornburgh was "ultimately in control" of the entire campaign, including all activities undertaken by the Committee. For any reasonable finder of fact, these would establish Thornburgh's membership in the Committee beyond cavil.

■ Even absent a finding that Thornburgh's activities with the Committee were sufficient to evince his intent to affiliate with that organization as a "member," based on these same interactions Thornburgh would have to be estopped from now denying his membership in the Committee. "[A] person may be estopped from denying membership in an association, particularly where · there has been active participation in its activities."[73] It seems clear to us that this rule applies with particular force when, as here, the candidate's sole purpose in claiming estrangement from the committee is the evasion of personal liability for the committee's debts,[74] especially where such claim is proffered *post hoc*.

As the facts of this case compel the conclusion that Thornburgh had the capacity to incur personal liability for the debts of the Committee, we next consider whether he did so.

### 2. Thornburgh Assented to the September Contract

For Thornburgh to be held liable for the September Contract, the evidence must show that he, or his agent for him, authorized, assented to, or ratified that agreement. The district court found that Thornburgh assented to the September Contract. We agree.

■ As a general proposition in the context of the law of unincorporated nonprofit associations—and thus unincorporated political committees—"assent" connotes "approval" and is roughly equivalent to authorization.[75] Assent can be express or tacit. To manifest tacit assent to a contract through conduct, one must "[intend] to engage in the conduct and know[ ] or ha[ve] reason to know that the other party may infer from his conduct that he assents."[76] "A person has reason to know a fact ... if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist."[77] Absent more, however, a member's mere knowledge that his association entered into a contract is insufficient to establish that he tacitly assented to the contract.[78] Whether a principal assented to a transaction is a question of fact,[79] a finding of which will be reversed only if clearly erroneous.

**73.** 7 C.J.S. *Associations* § 19, at 54 (citing *Electrical Contractors' Ass'n v. A.S. Schulman Elec. Co.*, 391 Ill. 333, 63 N.E.2d 392, 397 (1945) (defendant corporation sent representative to meetings of, and paid dues to, association); *Francis v. Perry*, 82 Misc. 271, 144 N.Y.S. 167, 173 (Oneida County Ct.1913) (defendant attended meeting, was elected as member, voted at meetings, and became an officer of and made payments to the association)); *see also Hann v. Nored*, 233 Or. 302, 378 P.2d 569, 574–75 (1963) (considering, but not deciding, whether a person was a member, where the person paid dues to and attended two meetings and was listed on the mailing list of the association).

**74.** Inapposite to the ·instant case are decisions discussing whether a person or entity is a "member" of an association, where the association has established particular requirements for membership. *See, e.g., NLRB v. J.D. Indus. Insulation Co.*, 615 F.2d 1289, 1292–94 (10th Cir.1980) (reversing NLRB finding that company was estopped from denying membership in national association, where company did not file an application for membership, pay an initiation fee, or appear on membership list): *United Nuclear*

*Corp. v. NLRB*, 340 F.2d 133, 136–37 (1st Cir. 1965) (where labor union constitution imposes requirements for membership, membership will not be inferred by the acts of attending meetings and voting).

**75.** BLACK'S LAW DICTIONARY 115 (6th ed. 1991).

**76.** RESTATEMENT (SECOND) OF CONTRACTS § 19(2).

**77.** *Id.* § ·19 cmt. b.

**78.** *Bloom v. Vauclain*, 329 Pa. 460, 198 A. 78, 79 (1938) ("[E]ven if [the member] knew [the services] were being purchased, that fact could not be used as the basis for a presumption that he assented and would be personally bound therefor.").

**79.** JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS § 2–19 (3d ed. 1987); *see Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 176 Ill.Dec. 357, 371, 601 N.E.2d 1055, 1069 (" '[T]he liability of the participating, assenting or ratifying members [of a voluntary association] is joint and several, and that is a

We deem it important to remember that, when we discuss Thornburgh's "assent to" the September Contract, we are asking only whether Thornburgh tacitly or implicitly agreed with the Committee's decision to contract for direct mail fundraising services. Had he expressly agreed to become personally liable for the September Contract, our inquiry would be at an end; we would have no need to consider the concept of *assent* in the context of unincorporated nonprofit associations. But under that concept in that context, Thornburgh's liability attached by operation of law at the time he concurred with the Committee's decision to enter into the September Contract.[80] (We are aware that some state courts in New York have stated that members and officers are not liable for the debts of a campaign committee "[a]s long as the members don't intend to be personally liable."[81] To the extent that this rule may correctly state the law of New York, we note simply that, regardless of whatever approval such a rule might have there or elsewhere, it is not the legal standard in either Texas or Pennsylvania, and we have no authority as an *Erie* court to change the settled law of either state by substituting the New York rule for those extant in Texas and Pennsylvania.)

We are therefore concerned here only with the question whether Thornburgh acted in a manner that evinced agreement with the Committee's decision to enter into the September Contract with Rove & Company for direct mail fundraising services. Once that question is posed properly, the answer becomes self-evident. The district court concluded that through his actions Thornburgh manifested his agreement with the Committee's decision to procure direct mail fundraising services. In particular, the court found that Thornburgh (1) knew that Dickman had hired some person or company to provide direct mail services; (2) played a direct role in the fulfillment of that contract by furnishing his signature exemplar, by reviewing, editing, and approving drafts of fundraising letters, and by supplying lists of names and addresses to which such correspondence would be sent; (3) understood that the letters were written on his behalf and that his approval meant that some contractor had the authority to mail them; (4) knew that the funds raised by these solicitations were, in fact, used for the sole purpose of promoting his election; and (5) admitted that he had the authority, if he desired, to stop such fundraising efforts at any time.[82] Based on these discrete factual findings—all

question for the [factfinder] to determine to whom the credit was given and whether the members authorized or ratified the contract.'") (quoting *Severinghaus Printing Co. v. Thompson*, 241 Ill.App. 35, 39 (1926) (second alteration in original)), *cert. denied*, 148 Ill.2d 653, 183 Ill. Dec. 31, 610 N.E.2d 1275 (1993).

**80.** *Summerhill v. Wilkes*, 133 S.W. 492, 493 (Tex. Civ.App.1910, no writ) (stating that member of church, an unincorporated nonprofit association, who signed contract is responsible individually, "although in signing the same as chairman of the building committee it was not his intention to become individually liable"); *see also Victory Comm. v. Genesis Convention Ctr.*, 597 N.E.2d 361, 365 (Ind.Ct.App.1992) (stating that "[t]he issue is not ... whether [the member] agreed to become personally liable for the debts of the Committee. Rather, the issue is whether they assented to the contract. If so, they became personally liable by operation of law.").

**81.** *Xerox Corp. v. Rinfret*, 153 Misc.2d 310, 589 N.Y.S.2d 723, 724 (N.Y. City Civ.Ct.1992); *cf. Empire City Job Print, Inc. v. Harbord*, 244 A.D. 6, 277 N.Y.S. 795 (App.Div.1935) (stating that, even though defendants assented to contract, they could not be held personally liable absent a

showing that they extended personal credit); *Richmond Advertising/Reinhold Assocs., Inc. v. Del Giudice*, 66 A.D.2d 701, 411 N.Y.S.2d 251 (App.Div.1978) (applying *Empire City*); *see also W.H. Brewton & Sons, Inc. v. Kennedy*, 110 Daily Wash.L.Rep. 1681 (D.C.Super.Ct.1982) (stating that candidate would be liable upon a showing that he "he authorized or ratified the obligation in a manner that reasonably implicated his personal credit").

We also note that seventy-five years ago, Judge Polley in *Robbins Co. v. Cook*, 42 S.D. 136, 173 N.W. 445 (1919), argued in dissent for a similar standard in a slightly different context. He stated that members of the South Dakota Panama Pacific Exposition Commission, an unincorporated nonprofit association organized at the behest of the governor to finance an exhibit for the state, should not have been held liable for a contract entered into by that association as the members did not clearly express their intent to incur a personal responsibility. The majority rejected Judge Polley's argument, applied the majority rule governing unincorporated nonprofit organizations, and held the members liable.

**82.** *Karl Rove & Co. v. Thornburgh*, 824 F.Supp. 662, 674–75 (W.D.Tex.1993).

of which are supported by the record, and none of which are contested by Thornburgh—the district court concluded that Thornburgh assented to the Committee's decision to retain the services of a direct mail fundraiser, Rove & Company in this instance. Whether Thornburgh knew the identity of the fundraiser selected by the Committee is irrelevant and immaterial. The record does not tell us that those facts are clearly erroneous or that the district court's conclusion based on those facts requires reversal.

Thornburgh nevertheless insists that the district court erred in its analysis. He objects in particular to the district court's reliance on the fact that Thornburgh "provid[ed] signature exemplars, review[ed] drafts, and provid[ed] a list of contributors." He contends that, as these acts occurred for the most part well before September 18, 1991, they had no nexus with the September Contract. He insists, for the district court to rely on such attenuated acts as a basis of its finding that Thornburgh assented to that agreement is improper. As we do not agree, we do not conclude that the district court erred in relying on this evidence.

We first observe that all of these prior acts anticipated and directly facilitated the performance of direct mail solicitations in general and the September Contract in particular. For example, in mailings made pursuant to the September Contract, Rove & Company used the signature exemplar and excerpts previously edited and approved by Thornburgh.[83] Evidence that a member of an as-

sociation actively facilitated the performance of a contract entered into by the association—even prospectively—is certainly probative of whether that member agreed with the association's decision to enter into that same agreement.

As the court must determine whether Thornburgh (as principal) assented to the contract entered into by the Committee (as his agent), it was not error for the district court to consider Thornburgh's actions antedating the September Contract. Contrary to Thornburgh's assertions, both the prior and contemporaneous actions of a principal can be relied on to ascertain whether the principal approved of a particular transaction.[84] Moreover, the fact that Thornburgh cooperated in the Committee's direct mail fundraising effort before, during, and after the Committee entered into the September Contract strongly supports the conclusion that he continuously approved of Rove & Company's work for the Committee.[85]

Thornburgh also posits that he could not assent to a contract the terms of which he did not know. In this case, however, it is clear that Thornburgh knew the substance of the contract if not the details: he reviewed the letters to be sent; knew they were being prepared by a direct mail vendor; knew that the vendor was charging for its services; and knew (or should have known) the identity of the vendor.[86] Knowledge of these facts is sufficient for Thornburgh to be able to assent to the September Contract.[87]

83. See id. at 675 n. 21 (finding that "there was very little variation in the different form letters.... Thus, once Thornburgh had approved the content and language of a given story or statement attributed to him, there would be no need for him to review subsequent letters reincorporating the same substance.").

84. See Armstrong v. Palmer, 218 S.W. 627 (Tex. Civ.App.1920, writ refused).

85. See RESTATEMENT (SECOND) OF AGENCY § 43(2) ("Acquiescence by the principal in a series of acts by the agent indicates authorization to perform similar acts in the future.").

86. Recall that the district court credited Rove's testimony that he met Thornburgh and identified himself as the person providing the direct mail services, and that Thornburgh responded by telling Rove that he was doing a good job and to keep up the good work.

87. RESTATEMENT (SECOND) OF CONTRACTS § 23 cmt. e (1981) ("An offeree, knowing that an offer has been made to him, need not know all its terms."); see Land Title Co. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex.1980) (knowledge of "transaction" necessary for ratification); see, e.g., Progress Printing Corp. v. Jane Byrne Political Comm., 235 Ill.App.3d 292, 176 Ill.Dec. 357, 371, 601 N.E.2d 1055, 1069 (1992) (holding candidate liable for committee's contract because "like any member of a voluntary association who knows, or should have known under the circumstances, that a transaction has occurred and who then accepts its benefits for herself, the candidate here may be held liable for the Committee's debts"), cert. denied, 148 Ill.2d 653, 183 Ill.Dec. 31, 610 N.E.2d 1275 (1993); Leslie v. Bendl, 92 Or.App. 519, 759 P.2d 301 (1988) (holding officer of association liable on basis that he "knew or should have known that the association had filed the action [and] ... did not object to the filing"); see also Vader v. Ballou, 151 Wis. 577, 139 N.W.

But even if Thornburgh's knowledge were insufficient, he cannot shield himself from liability merely by failing to read or otherwise familiarize himself with a contract entered into by his agent, when as here the initial proposal and the subsequent agreement were readily available.[88] Both the initial proposal and the September Contract were provided to Dickman, both an employee of the Committee and Thornburgh's longtime "Man Friday." Rove sent the initial fundraising proposal to Dickman; later, Rove provided a copy of the September Contract to Mason, who, in turn, forwarded the agreement to Dickman. Thornburgh was aware that the Committee was going to obtain direct mail fundraising services and that it had subsequently entered into an agreement to obtain such services. Had Thornburgh desired, he easily could have obtained a copy of the September Contract and reviewed its terms. The fact that Thornburgh never availed himself of the opportunity—remaining deliberately ignorant—cannot now inoculate him from personal liability. It would be inequitable to hold otherwise: An affiliate of an association who (1) knowingly benefits from an association's contract, (2) directly facilitates the performance of such contract, and (3) claims the right to terminate the activities therein contracted for, cannot be permitted to escape personal liability for such association's contract merely because he remains willfully ignorant of the specific terms of the association's agreement, the existence of which is known to him.

Thornburgh contends finally that the acts relied on by the district court as evidencing assent constitute nothing more than ordinary interactions that any federal candidate would have with his principal campaign committee. He argues that if such actions are held to manifest assent to a contract, virtually every candidate could be held to have assented to virtually every contract entered into by his campaign committee so long as the candidate is needed to facilitate performance of the contract.

Like others before us, we recognize that the application of the law governing the liability of members for the debts of their unincorporated nonprofit association may sometimes lead to harsh or even subjectively unintended results. In fact, one commentator has ventured that the choice of this form of organization "usually results from sheer ignorance of the possible degree of personal liability of its members."[89] Thus, although we do not join Thornburgh in speculating on the extent to which future candidates could be held liable for the debts incurred by their unincorporated campaign committees, we are constrained to note in passing that he is not the first candidate to be held liable or potentially liable for his committee's debts. The list includes many widely recognized names, including: Senator Edward Kennedy,[90] Senator James Abdnor,[91] Senator Kenneth D. McKellar,[92] Senator Vance Hartke,[93] Senator

413 (1913) (holding members of a campaign committee liable for a contract debt as they "had knowledge that this work was being done and this material furnished, that it must be paid for, that it was adapted to the purpose for which they had organized themselves into a committee, and that it was a disbursement necessary to effectual (sic) work").

**88.** *See Pandem Oil Corp. v. McKinney,* 3 S.W.2d 466 (Tex.Civ.App.1927, writ dismissed w.o.j.); *see also Jane Byrne Political Comm.,* 176 Ill.Dec. at 369–70, 601 N.E.2d at 1067–68 ("[A]lthough normally a principal's actual knowledge of the transaction is essential, one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts.").

**89.** OLICK & STEWART, *supra* note 35, § 48, at 144.

**90.** *W.H. Brewton & Sons, Inc. v. Kennedy,* 110 Daily Wash.L.Rep. 1681, 1686 (D.C.Super.Ct.1982) (stating that candidate would be liable for committee's contract if the facts show that "he authorized or ratified the contract in a manner that reasonably implicated his personal credit"); *see W.H. Brewton & Sons, Inc. v. Kennedy,* 110 Daily Wash.L.Rep. 2222 (D.C.Super.Ct.1982) (denying candidate's motion to dismiss complaint, as allegations raised issue whether candidate's actions established actual or apparent authority).

**91.** *See Metro Printing & Mailing Servs., Inc. v. Abdnor,* No. 81–0877(A) (denying motion to dismiss suit alleging Senator was personally liable for contract entered into by his principal campaign committee, where plaintiff submitted evidence that Senator authorized and accepted its services and had ratified the acts of his committee) (discussed in *Kennedy,* 110 Daily Wash. L.Rep. at 1686)).

**92.** *Rich Printing Co. v. Estate of McKellar,* 46 Tenn.App. 444, 330 S.W.2d 361 (1959) (candidate's estate held liable).

Allen J. Ellender,[94] James M. Collins (candidate for the U.S. Senate),[95] Peter Parker (candidate for the U.S. Congress),[96] Alabama gubernatorial candidate Guy Hunt,[97] Tennessee gubernatorial candidate Randy Tyree,[98] Louisiana gubernatorial candidate, William L. Clark,[99] Alabama Attorney General candidate T. Dudley Perry,[100] Chicago Mayor Jane Byrne,[101] and Gary (Indiana) Mayor Richard Hatcher.[102]

We must reiterate, however, that regardless of how harsh or anomalous the results dictated by application of the law of unincorporated nonprofit associations may appear to some, wary candidates can easily avoid this trap—at least in states with laws like those of Texas and Pennsylvania—by either incorporating their campaign committee or specifying in all committee contracts that the purveyors of goods or services may look only to committee assets for compensation.

In sum, Thornburgh's actions, especially when viewed in light of his education, his experience, and his familiarity with the facts surrounding this matter, were no mere "string of trivialities" as Thornburgh would have this court believe. Rather, they confirm that he knew that the Committee would and did contract for direct mail fundraising services and that he approved, at least tacitly, the Committee's decision to enter into the September Contract. This is sufficient proof that Thornburgh assented to the agreement. Thus, we stand unconvinced that the district court erred by holding Thornburgh liable for the September Contract; we agree with the district court that "[g]iven his knowledge of the direct fundraising campaign, his control over the substance of the fundraising letters, and his authority to refuse to allow his signature to appear on any letter or to refuse to allow any letter to be mailed, Thornburgh did effectively say 'go ahead' with the direct mail campaign." [103]

### 3. Thornburgh's Liability Resulting From Dickman's Acts

The district court also found Thornburgh liable "as a result of Dickman's authorization of, and assent to, the contract." [104] Thornburgh does not contest the district court's finding that Dickman authorized or assented to the contract; rather, Thornburgh takes issue only with the court's conclusion that Dickman acted as Thornburgh's general agent with authority to enter into a contract with Rove & Company on Thornburgh's personal behalf.

"Under Texas law, agency is a mixed question of law and fact. To the extent that the facts are undisputed, the trial court's ruling is freely reviewable on appeal. However, where ... the facts are disputed, the clearly

**93.** *Hartke v. Moore–Langen Printing & Publishing Co.*, 459 N.E.2d 430 (Ind.Ct.App.1984) (candidate held liable).

**94.** *Innovative Data Sys. v. Ellender*, 316 So.2d 12 (La.Ct.App.1975) (heir of candidate held potentially liable).

**95.** *Collins v. Williamson Printing Corp.*, 746 S.W.2d 489 (Tex.App.—Dallas 1988) (candidate held liable).

**96.** *Parker v. Junior Press Printing Serv., Inc.*, 266 Md. 721, 296 A.2d 377 (1972) (candidate held liable).

**97.** *Hunt v. Davis*, 387 So.2d 209 (Ala.Ct.Civ.App.) (candidate held liable), *writ denied*, 387 So.2d 213 (Ala.1980).

**98.** *FDIC v. Tyree*, 698 S.W.2d 353 (Tenn.Ct.App. 1985) (Tenn.1985) (reversing trial court grant of summary judgment in favor of candidate); *see also FDIC v. Morrison*, Nos. 85–5272, 85–5273,

1987 WL 37065 (6th Cir. Apr. 14, 1987) (table opinion at 816 F.2d 679) (reversing district court grant of summary judgment in favor of candidate).

**99.** *Rehm v. Sharp*, 144 So. 78 (La.Ct.App.1932) (candidate held liable).

**100.** *Perry v. Meredith*, 381 So.2d 649 (Ala.Ct.Civ. App.1980) (candidate held liable).

**101.** *Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 176 Ill.Dec. 357, 601 N.E.2d 1055 (1992) (candidate held liable), *cert. denied*, 148 Ill.2d 653, 183 Ill.Dec. 31, 610 N.E.2d 1275 (1993).

**102.** *Victory Comm. v. Genesis Convention Ctr.*, 597 N.E.2d 361 (Ind.Ct.App.1992) (candidate held liable).

**103.** *Karl Rove & Co. v. Thornburgh*, 824 F.Supp. 662, 675 (W.D.Tex.1993).

**104.** *Id.* at 675.

erroneous standard applies." [105] As Thornburgh does not contest the factual findings upon which the district court based its conclusion that Dickman acted as Thornburgh's general agent, we review de novo that court's legal conclusion.[106]

Agency is a legal relationship created by an express or implied agreement or by operation of law whereby the agent is authorized to act for the principal, subject to the principal's control.[107] As in the formation of any contract, the consent of both parties is necessary to establish an agency relationship.[108] Agency is never to be presumed; it must be shown affirmatively.[109] The party who asserts the existence of agency relationship has the burden of proving it.[110] To prove an agency relation under Texas law, there must be evidence from which the court could conclude that "[t]he alleged principal [had] the right to control both the means and the details of the process by which the alleged agent [was] to accomplish the task." [111]

Thornburgh argues that Rove failed to meet that burden. Specifically, Thornburgh contends that Dickman was the Committee's agent, not Thornburgh's; or, in the alternative, that if Dickman was Thornburgh's agent, it was for the general purposes of running the political side of the campaign—not for the purpose of imposing personal liability on Thornburgh for the debts of the Committee. Thornburgh reminds us that both he and Dickman testified that Dickman was not expressly authorized to act as Thornburgh's agent for any purpose—much less to enter into a contract for Thornburgh personally—and that there is no direct evidence in the record to refute this testimony and support the district court's findings to the contrary.[112]

### a. Dickman As Thornburgh's Agent

Although both Thornburgh and Dickman testified that Thornburgh had not constituted Dickman as Thornburgh's agent for any purpose, agency can be implied from

**105.** *In re Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 598 n. 2 (5th Cir.1991) (citing *American Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 539 (5th Cir.1987)); *see Ross v. Texas One Partnership,* 796 S.W.2d 206, 209–10 (Tex.Ct.App.—Dallas 1990, writ denied) ("Although the question of agency is generally one of fact, the question of whether a principal-agent relationship exists under established facts is a question of law for the court.").

**106.** *Glauser v. State Farm Life Ins. Co.,* No. 01–93–00015–CV, 1994 WL 470355, at *14 (Tex.Ct. App.—Houston [1st Dist.] Aug. 31, 1994); *see In re Incident Aboard D/B Ocean King,* 813 F.2d 679, 688–89 (5th Cir.1987), *modified on other grounds by* 877 F.2d 322 (5th Cir.1989). *See generally* 1 STEVEN A. CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 2.18, at 2–125 to 2–127 (2d ed. 1992) (noting that, although many courts agree that mixed questions in general are freely reviewed, more and more courts now attempt to sort out whether the question primarily involves a factual inquiry (reviewed under clearly erroneous standard) or a legal inquiry (reviewed de novo)).

**107.** *Lubbock Feedlots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 269 (5th Cir.1980) (citing *Sorenson v. Shupe Bros. Co.,* 517 S.W.2d 861, 864 (Tex.Civ.App.—Amarillo 1974); *Tarver, Steele & Co. v. Pendleton Gin Co.,* 25 S.W.2d 156, 158 (Tex.Civ.App.—Eastland 1930); and *Valley View Cattle Co. v. Iowa Beef Processors, Inc.,* 548 F.2d 1219, 1221 (5th Cir.), *cert. denied,* 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977)); *Hall Dade-*

*land Towers Assocs. v. Hardeman,* 736 F.Supp. 1422, 1429 (N.D.Tex.1990) (citing *Carr v. Hunt,* 651 S.W.2d 875 (Tex.Ct.App.—Dallas 1983, writ refused n.r.e.)); 3 TEX.JUR. *Agency* § 1.

**108.** 3 TEX.JUR. *Agency* § 13.

**109.** *Glauser,* 1994 WL 470355, at *14; *see Girard Trust Bank v. Sweeney,* 426 Pa. 324, 231 A.2d 407, 410 (1967); *Buchoz v. Klein,* 143 Tex. 284, 184 S.W.2d 271 (1944).

**110.** *Jones v. Philpott,* 702 F.Supp. 1210 (W.D.Pa. 1988) (Pennsylvania law), *aff'd,* 891 F.2d 281 (3d Cir.1989); *Norton v. Martin,* 703 S.W.2d 267, 272 (Tex.Ct.App.—San Antonio 1985, writ refused n.r.e) (Texas law).

**111.** *In re Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 598 (5th Cir.1991); *see United States v. Contemporary Health Management,* 807 F.Supp. 47, 49 (E.D.Tex.1992) ("Under Texas agency law, the essential element is the 'right of control' of the purported agent by the purported principal.").

**112.** In fact, Thornburgh argues that the court based its finding solely on the fact that it did not believe Thornburgh's and Dickman's testimony to the contrary, and " '[a] trial judge may not use his disbelief of a witness as affirmative support for the proposition that the opposite of the witness's testimony is the truth.' " *Seymour v. Oceanic Navigating Co.,* 453 F.2d 1185, 1191 (5th Cir.1972) (alteration in original)).

the conduct of the parties under the circumstances.[113] In the instant case, Dickman (the person authorized to answer interrogatories on behalf of the Committee) admitted in the Committee's answers to Rove & Company's interrogatories that he was "the primary point of contact between the Committee and Defendant Richard Thornburgh." Dickman also acknowledged that he was known as "an intermediary" to Thornburgh regarding, inter alia, the running and organizing of Thornburgh's campaign. Thornburgh solicited Dickman's opinion on a "day-to-day basis" about campaign activities, including broad campaign strategies, where Thornburgh should speak, and what issues Thornburgh should address. Thornburgh used Dickman as his go-between to provide mailing lists, a signature exemplar, and edited solicitation letters to the Committee to facilitate the Committee's direct mail contract with Rove & Company. Thornburgh testified that Dickman was a "loyal friend," who had served as a high-level assistant to Thornburgh during several of Thornburgh's campaigns and while Thornburgh served in various government positions.[114]

Consistent with a principal's role, Thornburgh retained the ultimate authority over Dickman and Dickman's activities within the Committee. For example, even though Dickman took part in the Committee's decision to hire Davis as the Committee's Campaign Manager, Dickman acknowledged that, had Thornburgh disapproved of this choice, another campaign manager would have been selected. In addition, although Dickman authorized and assented to the Committee's contract with Rove & Company, Thornburgh

retained control over the content of the fundraising letters and whether the letters would be mailed at all.[115] Finally, Thornburgh was the only person authorized to grant the Committee (and thus its employees, one of whom was Dickman) the authority to raise and spend funds on Thornburgh's behalf. Thornburgh thus had the right to withhold his authorization of the Committee, a decision that would have halted *all* Committee activities—including Dickman's. Consequently, the evidence supports the district court's finding that Dickman served as Thornburgh's agent acting under Thornburgh's control. Nevertheless, we still must determine the scope of Dickman's authority.

### b. The Scope of Dickman's Authority

An agent has only as much authority as the principal has either expressly or impliedly conferred.[116] The extent of an agent's authority is determined in light of all surrounding circumstances, including, inter alia, the parties' relations to one another, the undertaking in which the parties are engaged, and the general usages and practices of those engaged in such undertakings.[117]

The district court found that Dickman acted as Thornburgh's general agent, or, "[a]t the very least, Dickman had apparent authority to act on Thornburgh's behalf with respect to the campaign and, specifically, the agreement with Rove."[118] Thornburgh counters that even if Dickman did act as Thornburgh's agent, he was authorized only to run the political side of the campaign, not to enter into contracts making Thornburgh personally liable.

---

113. *Grace Community Church v. Gonzales*, 853 S.W.2d 678, 680 (Tex.Ct.App.—Houston [14th Dist.] 1993); *Kirby Forest Indus., Inc. v. Dobbs*, 743 S.W.2d 348, 356 (Tex.Ct.App.—Beaumont 1987, writ denied); *see Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir.1975); *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992) (per curiam); 3 Tex.Jur. Agency § 16.

114. Contrary to Thornburgh's assertions, it was proper for the district court to consider Dickman's relationship to Thornburgh in determining whether Dickman acted as Thornburgh's agent. Although agency cannot be proven by evidence of the alleged agent's *general reputation* as the agent of the alleged principal, this does not mean that a court cannot look to the *relationship* between

the parties and their conduct concerning the transaction in controversy as competent evidence of an agency relationship. *See Union Producing Co. v. Allen*, 297 S.W.2d 867 (Tex.Civ.App.1957); Restatement (Second) of Agency § 34.

115. *See Karl Rove & Co. v. Thornburgh*, 824 F.Supp. 662, 668, 675 & n. 21 (W.D.Tex.1993).

116. *See* Restatement (Second) of Agency § 33 ("An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do . . . .").

117. *See id.* § 34.

118. *Karl Rove & Co.*, 824 F.Supp. at 671.

Although we recognize that there is some evidence and authority to support the district court's conclusion that Dickman was acting as Thornburgh's general agent, authorized to enter into the September Contract for Thornburgh personally,[119] we need not go that far to hold Thornburgh liable here. The record makes clear that Dickman acted as Thornburgh's agent to the Committee and was authorized to represent Thornburgh in all Committee activities, including whether to enter into the September Contract. This finding alone is sufficient to hold Thornburgh personally liable, given Thornburgh's acknowledgement that Dickman authorized and assented to that Committee's contract with Rove & Company.

As discussed earlier, for Thornburgh to be liable for the September Contract, Rove & Company had only to prove that Thornburgh authorized, assented to, or ratified the Committee's decision to enter into the agreement. Thornburgh could manifest his authorization or assent personally or through an agent. In the instant case, the record is clear that Dickman, as Thornburgh's representative to the Committee, authorized or assented to the September Contract.

Much of the same evidence that establishes that Dickman acted as Thornburgh's agent also supports the district court's findings that Dickman was Thornburgh's "primary point of contact" with the Committee[120] and that "Dickman's role in the Committee was obviously to assure Thornburgh's interests would best be served and to be Thornburgh's

voice."[121] There is no indication that these findings by the district court were clearly erroneous. We also note that Thornburgh testified that it is customary during a political campaign for a candidate to rely on others, such as Dickman, to manage the day-to-day operations of the campaign—which operations would include such things as the purchase of services necessary to support the candidacy. As it is customary to rely on others for such services, and as the district court found that Dickman was the primary person upon whom Thornburgh relied during his senatorial campaign, we are led to but one conclusion: Dickman, as Thornburgh's representative to the Committee, had either actual or apparent authority to bestow Thornburgh's blessings on Committee activities, which included the Committee's decision to contract with Rove & Company. As Dickman had such authority, and as Thornburgh concedes (and the record substantiates with uncontroverted evidence) that Dickman authorized and assented to the September Contract, Thornburgh can also be found liable for the September Contract as a result of Dickman's authorization and assent to the Committee's decision to enter into that agreement.[122] Consequently, we need not, and do not, reach the issue whether Thornburgh also is personally liable because Dickman acted as Thornburgh's general agent vis-á-vis Rove & Company, vested with authority to enter into pacts such as the September Contract and bind Thornburgh personally.

---

119. See *Hunt v. Davis*, 387 So.2d 209 (Ala.Ct.Civ. App.) (candidate held liable based on contract entered into by employee of campaign committee), *writ denied*, 387 So.2d 213 (1980). We find distinguishable other cases holding candidates liable based upon the actions of an alleged agent contracting with a vendor on the personal behalf of the candidate. *See, e.g., Hartke v. Moore–Langen Printing & Publishing Co.*, 459 N.E.2d 430 (Ind.Ct.App.1984) (vendor testified that purported agent identified himself as candidate's agent); *Rehm v. Sharp*, 144 So. 78 (La.Ct.App. 1932) (unclear whether campaign committee existed, candidate's designated campaign manager thus had actual or implied authority to incur expenses on behalf of campaign); *Rich Printing Co. v. Estate of McKellar*, 46 Tenn.App. 444, 330 S.W.2d 361 (1959) (primary campaign organization was not a voluntary nonprofit association, thus campaign manager acted as candidate's general agent during a primary campaign).

120. *Karl Rove & Co.*, 824 F.Supp. at 668.

121. *Id.* at 676.

122. As we find Thornburgh liable on this basis, Thornburgh's other assertions explaining why Dickman could not enter into a contract for Thornburgh personally are irrelevant to the resolution of this dispute. It is immaterial whether Thornburgh lacked capacity to contract with Rove & Company, and thus could not delegate such authority to Dickman, because Dickman contracted with Rove & Company on the Committee's behalf—not for Thornburgh personally. Likewise, it is unimportant to the issue whether Dickman acted as Thornburgh's agent on the Committee whether, as Thornburgh alleges, Rove was an experienced vendor who believed that he could contract only with the Committee, and thus looked to the Committee alone, not Thornburgh, for payment.

## C. PERSONAL JURISDICTION OVER DIMUZIO

Guarding against the possibility that we might reverse the district court's decision holding Thornburgh personally liable for the September Contract, Rove & Company filed a cross appeal in the alternative, contesting the portion of the district court judgment holding that it lacked personal jurisdiction over Dimuzio. As we conclude that Thornburgh is liable on the contract, we do not reach this jurisdictional issue.

In addition to urging affirmance of the dismissal of the suit against him, however, Dimuzio as cross-appellee seeks double costs as a sanction against Rove & Company for filing a frivolous appeal of the district court's ruling dismissing Dimuzio for lack of personal jurisdiction. Although we agree with Dimuzio that Rove & Company provided no authority and little argument in the section of its brief designated as addressing its cross appeal, we believe that, when read in its entirety, Rove & Company's brief adequately explains the basis upon which it believed that Dimuzio could be held amenable to the district court's jurisdiction and liable for the Committee's debt. Thus, Rove & Company's cross appeal was not so baseless as to constitute frivolousness for purposes of sanctions. Accordingly, in the exercise of our discretion, we elect to consider Rove & Company's cross appeal non-frivolous in the context of the entire case and in light of the content of Rove & Company's entire brief. We thus deny Dimuzio's request for sanctions.

### III

### CONCLUSION

The outcome of this case is dictated by the laws of Texas and Pennsylvania. Under these laws, we are compelled to conclude that Thornburgh personally is jointly and severally liable with the Committee on the September Contract with Rove & Company.

As we observed, relatively little time and money are required to incorporate a campaign committee or to ensure by express contractual provisions that all committee agreements exclude personal liability of the candidate. Thus we are satisfied that sufficient legal protection for candidates is already available in the law, if candidates just avail themselves of these existing safeguards.

Otherwise, the law regarding unincorporated nonprofit associations will supply the rules, and uncautious candidates will be left to shoulder the financial consequences of their imprudence.

For the reasons detailed above, we AFFIRM the district court judgment to the extent it holds Thornburgh liable for the debts of the Committee, and DISMISS as moot the cross appeal of the court's dismissal of Rove & Company's claim against Dimuzio. And we DISMISS Dimuzio's request for sanctions.